Vernon v. Cuomo, 2009 NCBC 6.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION |
| WAKE COUNTY | 06CVS8416 |

PAUL VERNON and JOEL WILLIAMS,
individually and derivatively on behalf
TRIBOFILM RESEARCH, INC.,

             Plaintiffs,

    v.

JEROME CUOMO, VINAY
SAKHRANI, CHARLES TOMASINO,
CHARLES K. CHIKLIS, ROBERT A.
MINEO, and TRIBOFILM RESEARCH,
INC.,

             Defendants.

**ORDER & OPINION**


*Northen Blue, LLP by Samantha H. Cabe and David M. Rooks, III for Plaintiff Paul Vernon.*

*Manning Fulton & Skinner, P.A. by Michael T. Medford, David B. Efird, and William S. Cherry, III for Plaintiff Joel Williams.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP by Mark A. Ash, Addie K.S. Ries, Heather Adams, and Kelli A. Ovies for Individual Defendants Jerome Cuomo, Vinay Sakhrani, Charles Tomasino, Charles K. Chiklis, and Robert A. Mineo.*


Tennille, Judge.

{1} This action was filed in Wake County Superior Court on June 8, 2006. Plaintiffs Vernon and Williams filed the Notice of Designation simultaneously with the Complaint on June 8, 2006. This action was designated a mandatory complex business case by Order of the Chief Justice on June 12, 2008, and subsequently assigned to the undersigned Chief Special Superior Court Judge for Complex Business Cases.

{2} This matter was bifurcated for trial. The issues involving liability were tried without a jury in the North Carolina Business Court in Wake County from February 2, 2009 to February 9, 2009. Based upon the evidence presented at trial, the Court makes the following Findings of Fact and Conclusions of Law and enters the following Orders:


## FINDINGS OF FACT

### TriboFilm

{3} TriboFilm Research, Inc. ("TriboFilm" or "the Company") was founded in 1997 as a research and development company. TriboFilm initially focused on vacuum deposited coatings for use on syringe stoppers and optical lenses. All five original shareholders were scientists with connections to North Carolina State University ("N.C. State"), and they were the only "employees" of the Company.

{4} TriboFilm's syringe coating was aimed at eliminating silicone as a lubricant in syringes. The elimination of silicone as a lubricant in syringes was desirable because silicone can migrate from the surfaces to which it is applied. The migration can have two harmful effects. It can contaminate the fluid in the syringe, and it can cause friction that makes delivery of the fluid less consistent. Almost all syringes now use some form of silicone lubricant. Using silicone makes it difficult for the medical device industry to provide pre-filled syringes, especially for high priced medications. A breakthrough that eliminates the use of silicone has great

commercial potential and will improve the administration of medications by syringe from a health standpoint.

{5}     The Company first applied its vacuum deposited coating to syringe stoppers, then to syringe plungers, and, later, to the interior barrel of the syringe. TriboFilm had little success in coating the interior barrel of syringes until 2003, when it switched to the use of atmospheric plasma, rather than vacuum plasma, as the application method.  This change spawned the development of TriboFilm's silicone-free syringe coating that is now known as the "TriboGlide" technology. Development of this technology was funded largely by grants from the National Institute of Health ("NIH"), the last of which ended in late 2006.  TriboFilm achieved Federal Drug Administration ("FDA") 510k approval for TriboGlide in 2007 and was awarded a patent for the TriboGlide technology in 2008.  Both Vernon and Williams were named as inventors on the TriboGlide patent.  While the TriboGlide technology has a promising future, it has not yet achieved acceptance or widespread use by syringe manufacturers.

{6}     TriboFilm's optical lens coating also developed over time from a vacuum deposited coating to a "wet chemistry" coating known as "StaClear," which offers superior scratch resistant and graffiti resistant properties to optical lenses as well as other types of plastics.  Like TriboGlide, the development of StaClear has been funded largely by NIH grants, which grants have been successfully completed. TriboFilm received a patent for its StaClear technology in 2007.  TriboFilm has not yet found a commercial market for StaClear.

## TriboFilm's Shareholders

{7}     The initial idea for TriboFilm resulted from a conversation between Mr. Vinay Sakhrani ("Sakhrani"), who was doing his graduate course work at N.C. State, and his graduate professor, Dr. Jerome Cuomo ("Cuomo").  Mr. Paul Vernon ("Vernon"), who was working as Dr. Cuomo's lab administrator at the time, was later included in the conception of TriboFilm, as were the other founding shareholders, Dr. Charles Tomasino ("Tomasino") and Dr. Charles Chiklis

("Chiklis"). Drs. Tomasino and Chiklis were professors at N.C. State. They have both since retired from N.C. State.

{8}   Sakhrani graduated with a Master's Degree in Materials Science and Engineering from N.C. State in 1997. He was the youngest and least experienced member of the original group. Mr. Sakhrani now serves as Vice President of Technology for TriboFilm, and he has been a member of TriboFilm's Board of Directors since its inception. Sakhrani performs research in TriboFilm's lab on all areas of technology, with his major concentration in TriboGlide research. He has served as the primary investigator on the NIH grants for both the TriboGlide and StaClear technologies. Sakhrani has had direct contact with potential TriboFilm clients and has prepared samples for their evaluation. Since the termination of Plaintiffs' employment with TriboFilm in 2005, Sakhrani has also assumed responsibility for TriboGlide's business development and grant drafting, and the coordination of TriboFilm's day-to-day business operations. Sakhrani has been a full-time employee at TriboFilm since 2002.

{9}   Cuomo is a Distinguished Research Professor at N.C. State, where he serves as Director of the Institute for Maintenance Science and Technology ("IMST") and head of the Center for Advanced Materials Processes and Materials ("CAMP-M"). Prior to joining N.C. State, Cuomo had a thirty (30)-year career at IBM. While at IBM, Cuomo was charged with management of a large staff, and he developed several coatings techniques. Cuomo serves as President and Chairman of the Board of Directors for TriboFilm, where he advises TriboFilm about new development opportunities relating to the application of plasma process, assists with client presentations, and handles other business matters.

{10}  The concept of creating entrepreneurial or intrapreneurial companies that combine N.C. State faculty resources and equipment with startup companies was Cuomo's idea. Premitec and TriboFilm were small research and development companies designed to create technology on a shoestring or through government grants in the hope that the technology could then be licensed or sold commercially. Cuomo had the contacts and influence within N.C. State to foster these

entrepreneurial efforts. He was the creator of the TriboFilm group and its acknowledged leader. He did not, however, contribute significantly to the day-to-day research and development work. He functioned as a sounding board for technical issues, an idea generator, and, at times, a referee among the scientists.

{11} Prior to becoming a professor at N.C. State and joining TriboFilm, Tomasino had a career in the textile industry with Burlington Industries. At Burlington Industries, Tomasino was involved with coatings processes and atmospheric plasma. Chiklis previously had a long career at Polaroid, where he served as a senior manager and developed polymer coatings for Polaroid's products. At TriboFilm, Tomasino and Chiklis are primarily responsible for the development of the StaClear product, interfacing with patent counsel regarding StaClear, and marketing the StaClear technology. In addition, Tomasino helped develop the TriboGlide technology. He now assists with TriboGlide research and marketing. Tomasino also assists with the day-to-day business operations of TriboFilm.

{12} Tomasino and Chiklis are both retired professors from N.C. State. Both had experience in private industry before joining the N.C. State faculty. They were not the driving forces behind the creation of the Company, but they did a substantial amount of the day-to-day research and testing. They were the technical workhorses, especially on the StaClear project. They were paid on an hourly basis as provided in the various grants awarded to TriboFilm.

{13} While also working at TriboFilm, Vernon remained employed as a lab administrator in Cuomo's lab until 2002. Vernon initially served as the Secretary of TriboFilm, with responsibility for corporate formation of the Company. Vernon later assumed the role of President of the Company. Until his termination in November of 2005, Vernon handled the Company's accounting and business operations and coordinated grant applications and grant administration. While he helped some with research and experiments, his primary contribution was securing the grant money that supported the research. He also kept the venture alive when no funds were available and he was not being paid.

{14} In August 1998, Mr. Robert Mineo ("Mineo") became a five (5) percent

shareholder in TriboFilm, primarily in exchange for providing legal services. Mineo is a lawyer licensed to practice in North Carolina. He has a background in the aerospace and mechanical engineering field. Mineo now also assists with TriboFilm's business operations and customer presentations and negotiations. Prior to 2006, he did not play a substantial role in TriboFilm's business operations or research and development.

{15} Dr. Joel Williams ("Williams") was not an original shareholder or employee of TriboFilm. Williams provided consulting services to TriboFilm between 2000 and 2003, primarily assisting Vernon with drafting NIH grant applications. In December 2003, the Board of Directors voted to issue stock to Williams. Williams, like Cuomo, came from a business background. He had a long and successful career at Becton Dickinson, one of the largest suppliers of medical devices in the United States, before retiring from that company. Like Cuomo, he knew and understood the value and means of commercializing research and development projects, and as a result of his work at Becton Dickinson, Williams had particular knowledge and expertise with respect to syringe technology.

{16} Each of the scientists has made some significant contribution to TriboFilm's current success. Mineo's scientific contributions were not substantial; he basically functioned as a lawyer who got his ownership interest in return for providing legal services. Vernon's primary contributions were in securing funding for research and managing the operation. TriboFilm was the prototypical research and development company in which the owners contributed their time and individual expertise in the hope of producing a breakthrough commercial technology that could be licensed or sold for a large profit.

{17} Williams, Cuomo, Chiklis, and Tomasino were not participating in hopes of long-term employment. They were all at or near retirement age. This was not, however, a hobby for them. They were all seriously working to find a commercially viable technology. Their efforts may yet prove financially rewarding and also benefit the public health. Vernon and Sakhrani were younger, and employment and compensation were greater concerns to them.

## Ownership of TriboFilm

{18}   The following chart shows the ownership percentages of the individual shareholders at times relevant to this lawsuit.

|  | Original (%) | 1998 (%) | 2003 (%) | 2006 (%) | 2007 (%) |
|---|---|---|---|---|---|
| Cuomo | 61.5 | 56.5 | 20.2 | 12.0 | 19.04 |
| Vernon | 14.25 | 14.25 | 20.2 | 20.0 | 2.4 |
| Sakhrani | 14.25 | 14.25 | 20.2 | 12.0 | 19.04 |
| Tomasino | 5.0 | 5.0 | 8.1 | 12.0 | 19.04 |
| Chiklis | 5.0 | 5.0 | 6.1 | 12.0 | 19.04 |
| Mineo | 0.0 | 5.0 | 5.0 | 12.0 | 19.04 |
| Williams | 0.0 | 0.0 | 20.2 | 20.0 | 2.4 |

{19}   Prior to the changes in 2007, all previous changes in ownership had been accomplished with the consent of all shareholders.  Often the changes resulted from Cuomo's reducing his ownership interest.

## 2000 to 2005

{20}   By January 2000, Sakhrani had left TriboFilm and was working for another company called Premitec, and Defendants Cuomo, Tomasino and Chiklis were not playing an active role in the affairs of the Company.  Vernon was the only shareholder still actively engaged with the Company.  Cuomo was also a shareholder in Premitec, which was one of his entrepreneurial startup research and development companies.  Like TriboFilm, Premitec used N.C. State faculty and students.  Premitec was working on implant devices and did not compete with TriboFilm.  Cuomo and Sakhrani remained as directors and shareholders of TriboFilm.

{21}   In 2000, Cuomo introduced Williams to Vernon.  Vernon arranged for Williams to begin working as a consultant on an hourly basis for TriboFilm.  A few months earlier, Cuomo and Sakhrani had arranged for Williams to begin working as a consultant for Premitec.  Both companies sought to take advantage of Williams' knowledge in the medical device area and his familiarity with NIH grant processes.

{22}   In connection with the request by Cuomo and Sakhrani that Williams serve as a consultant for Premitec, Williams told them that he was doing his own research and development work following his retirement from Becton Dickinson.  In fact, he had his own research and development startup that was working on projects that did not compete with TriboFilm.  Williams operated under the name Brighton Development LLC ("Brighton"), which also did work under the name Genomex.  He applied for NIH grants under both names.  Vernon helped Williams with the Brighton grant applications, so he knew of Williams' other projects.  Neither Vernon nor Williams discussed those projects with anyone else at TriboFilm.  In March and July of 2002, Williams submitted grant applications on behalf of Brighton for a non-stick labware and for a self-sterilizing bag.  The non-stick labware and the self-sterilizing bag technologies did not compete with any of TriboFilm's technologies.

{23}   Williams signed a mutual confidentiality agreement with Premitec on or about June 15, 2000.  Sakhrani signed the mutual confidentiality agreement on behalf of Premitec.

{24}   Williams signed a mutual confidentiality agreement with TriboFilm on August 15, 2000.  Vernon, acting as President of TriboFilm, signed the mutual confidentiality agreement on behalf of TriboFilm.  Paragraph 8 of the mutual confidentiality agreement stated that the agreement would terminate five (5) years from the date of the agreement.

{25}   Williams requested that the confidentiality agreements with Premitec and TriboFilm be mutual in part because of the research and development work he was doing on his own.  All parties were content with these confidentiality agreements at the time.

{26}   Although the parties made much at trial of possible conflicts of interest on the part of others, there was no substantial evidence presented that any conflict of interest arose out of the work being done at Brighton, the work being done at Premitec, or the work being done at other companies in which Cuomo was involved. These were all research scientists who knew full well that the others had projects and employment other than TriboFilm.  TriboFilm was not structured to do anything other than the specific grant-supported research it was conducting.  No party engaged in any serious conflict of interest or usurped any business opportunity belonging to TriboFilm.

{27}   Later in 2000, TriboFilm obtained a Phase I grant from the National Heart, Lung, and Blood Institute (NHLBI) to explore certain medical coating technologies to replace silicone oil.  In April of 2002, TriboFilm was awarded a Phase II grant of $758,000 by the National Institute of Biomedical Imaging and Bioengineering (NIBIB) to develop a coating to eliminate silicone oil in medical syringes.  TriboFilm also obtained Phase I and Phase II grants to study lens coating technology, which led to the development of the Company's StaClear lens coating technology.  Vernon carried the administrative burden of preparing the grant applications and dealing with the NIH.  The other shareholders gave technical assistance.

{28}   After TriboFilm was awarded the grants, all of the Individual Defendants[1] developed renewed interest in TriboFilm and returned to active participation in the affairs of the Company.  Cuomo was designated Chief Technical Officer, and Sakhrani was elected as Vice President.  Sakhrani returned from Premitec to work full time at TriboFilm.  The grants provided that the researchers could be paid by the hour for their research work.

{29}   Williams' medical device experience, polymer science expertise, background in syringe technology, and business contacts in the medical device industry were valuable in the development of technologies at TriboFilm.  With numerous patents on syringe technology, including plasma cross-linking of

---

[1] The Individual Defendants are Cuomo, Sakhrani, Tomasino, Chiklis, and Mineo.

lubricants in syringes, he guided the research at TriboFilm in that area. Cuomo also contributed his expertise and valuable business contacts to TriboFilm. Sakhrani, Tomasino, Chiklis, and Williams all worked on various experiments, with Sakhrani, Tomasino, and Chiklis doing more research than anyone else. Vernon was the administrative manager. There were no employees other than the shareholders.

{30} In discussions with Vernon and Cuomo in mid-2003, Williams promised to take a more active role in TriboFilm and to provide the Company with his expertise and knowledge in the syringe technology field, including his expertise and knowledge relating to ionizing plasma cross-linking of lubricants in syringes. In exchange for his more active role, Williams was given an ownership interest in TriboFilm equal to the percentage held by Vernon, Cuomo and Sakhrani.

{31} There was a discussion at that time concerning a twenty-five (25) percent commission on new business brought in by Williams. These discussions never reached a definitive agreement for a number of reasons. At that time, TriboFilm had only grant money and some minor payments from potential customers for testing TriboFilm's unproven technology. It had no patents and no idea what its final product would be. The grants did not provide for payment of commissions, and the testing was not really for profit but to promote the development of technology. The agreement was never reduced to writing and was never approved by the Board of Directors. Until the filing of this lawsuit, Williams never asked for any commissions and none were ever paid to him or any other shareholder. No product was sold, and only contract work was performed. In March 2004, Williams was issued TriboFilm stock that gave him a twenty (20) percent interest in TriboFilm, equal to that of Vernon, Cuomo and Sakhrani. He did not pay anything for his stock. Prior to the issuance of the stock, Williams provided consulting services and helped develop business for TriboFilm, services for which he was not compensated. He was, however, compensated on an hourly basis for research done under the TriboGlide grant proposals.

{32}   None of the Individual Defendants or any other representative of TriboFilm asked Williams to discontinue his other work (such as his ongoing work at Brighton) when he became a consultant to TriboFilm, or later, when he became a shareholder.  Williams knew that they too had other business interests.

{33}    Each of the shareholders, including Individual Plaintiffs,[2] undertook the performance of his duties at TriboFilm with the reasonable expectation that each would share in the potential gain if one or more of the Company's technologies proved commercially viable.

{34}   By spring 2005, under the direction of Vernon, TriboFilm had significant grants to work on promising technologies, including StaClear and TriboGlide.

{35}   Based on the work performed by Williams and the other scientists, the syringe coating technology attracted significant interest from private firms interested in acquiring or obtaining the right to apply and market the technology.

{36}   To aid in the commercialization of the plasma cross-linked lubricant technology, TriboFilm obtained a Phase II-Continuation Grant for $687,000 to receive FDA regulatory approval.   Williams and Vernon contributed to the effort to obtain that grant.  During the interim proposal review period, both Williams and Vernon, along with other TriboFilm shareholders, personally financed TriboFilm by lending it money while waiting for NIH grant funding.

{37}   In 2005, Williams and Vernon successfully negotiated a license agreement for plasma cross-linked syringe lubricant technology with a German company.  The German company was one of the largest pre-filled syringe companies in the world.  Subsequently, TriboFilm declined to go forward with that agreement.  Williams contributed to the procurement of the agreement, and Vernon worked on the administrative effort.

{38}   Up until this point, this small band of researchers maintained productive working relationships.  While there were some personality conflicts between Vernon and Sakhrani—Sakhrani was unhappy that he was not getting the full salary authorized by the grants—no serious problem had arisen.  TriboFilm had a mutual

---

[2] Individual Plaintiffs are Vernon and Williams.

nondisclosure agreement with Williams, but it had no other agreements with shareholders about disclosure or use of TriboFilm technology. All the shareholders, however, owed fiduciary duties to the Company. At this point, no patents had been issued.

### The Shareholders Divide into Two Camps

{39}   In the spring 2005, communication between the shareholders broke down, and they began to split into two (2) camps—Vernon and Williams on one side and the remaining shareholders on the opposite side. What followed was a classic example of the loss of trust resulting from a failure to communicate.

{40}   In April 2005, Sakhrani delivered confidential documents belonging to Williams to Vernon and demanded an explanation. The confidential documents related to Williams' 2002 grant applications on behalf of Brighton, not work related to TriboFilm. Williams believed Sakhrani could only have gotten the documents by searching Williams' briefcase. Sakhrani said, however, that he got the documents from a trash bin or places where they were openly laying around. The documents showed that Vernon had helped Williams with the Brighton grant applications.

{41}   Despite Williams' and Vernon's multiple requests that Sakhrani return Williams' confidential documents, Sakhrani did not return all of the confidential documents until after Williams filed a lawsuit against Sakhrani in September 2005 seeking return of the confidential documents. Sakhrani consulted with other Individual Defendants regarding Williams' confidential documents. None of the other Individual Defendants looked at the documents because they believed them to be confidential. The other Individual Defendants did not, however, require Sakhrani to return the confidential documents to Williams.

{42}   During this same period, Sakhrani and Vernon were having a disagreement over Sakhrani's compensation.

{43}   In or about September 2005, Individual Defendants presented Williams and Vernon with non-compete and non-disclosure agreements. The agreements were drafted by Mineo using agreements prepared by an outside law firm as

templates. Mineo, as directed by a majority of the directors, added a provision to the non-compete agreement making it retroactive in application. In addition, the non-compete agreement did not call for any consideration other than continued employment. Vernon, in his capacity as President of TriboFilm, contracted with an outside law firm to prepare employment agreements as an alternative to those prepared by Mineo. The Board of Directors, however, cancelled the contract with the outside law firm and set October 3, 2005 as the deadline for executing the agreements created by Mineo. The non-disclosure agreement created by Mineo was not to be mutually binding on TriboFilm. Furthermore, the non-compete and non-disclosure agreements did not contemplate that anyone would execute the agreements on behalf of TriboFilm.

{44}   The Individual Defendants' request that Plaintiffs sign the retroactive non-compete agreement was motivated by Williams' work at Brighton that had pre-dated Williams becoming a shareholder in TriboFilm. Williams was reasonably concerned that the retroactive provision in the non-compete would expose him to litigation regarding his pre-existing Brighton work, which did not conflict with the work at TriboFilm. Since Vernon had helped with the Brighton grant applications, he was also concerned about the retroactive application of the proffered agreements.

{45}   Individual Defendants Cuomo, Sakhrani, Tomasino and Chiklis signed the tendered agreements with some minor modifications, but without change to the provisions relating to consideration and retroactivity. Individual Plaintiffs declined to sign the agreements as tendered. The whole process was characterized by a failure of the parties to communicate and adequately express their concerns. The process, which could have eliminated some of the lack of trust, contributed to a further erosion of the relationship among the shareholders.

{46}   At that time, Williams already had an existing employment agreement and mutual confidentiality agreement in place with TriboFilm—signed by Vernon in his capacity as president and by Williams—which the Board of Directors could have ratified had it chosen to do so. Except for the retroactive provisions, the terms of the proposed agreement were not unreasonable.

{47} Under all of the circumstances, Vernon's and Williams' decisions not to sign the retroactive non-competition agreement were reasonable. All shareholders had the right, however, to propose alternative provisions. Some shareholders did propose revisions, and their changes were accepted. Williams and Vernon did not communicate their problems in a way that the Company could address them. Nor did the Company make a great effort to solve the problem. Each side foolishly adopted a "my way or the highway" approach, and the failure to communicate resulted in a further deterioration of trust among the parties. The issues of language, compensation, and retroactivity were not unsolvable. They required candid communication. The shareholders had clearly separated into factions that did not trust each other. The lack of trust resulted from a number of factors, including: the personality problems between Vernon and Sakhrani, Sakhrani's mishandling of what he mistakenly believed was a conflict of interest, Vernon's failure to disclose he had assisted Williams with the Brighton grants, all parties' failure to openly discuss what else they were doing, Sakhrani's failure to return all of Williams' confidential documents and the copies, the parties' failure to sit down and discuss resolution of their differences, the differences of opinion over the German agreement, and the parties' failure to agree on creation of an affiliated company to manufacture syringes using TriboFilm's technology ("Jetcon"). Williams and Vernon had supported creation of Jetcon, and the Individual Defendants had opposed it.

{48} In the midst of all the turmoil, the Board of Directors created an Executive Committee in an effort to get control of the situation. Cuomo and Tomasino were named to the Executive Committee. They met with Vernon on several occasions, but they were unable to obtain from him information to assess the condition of the Company or information to assess his performance as President.

{49} To exacerbate the situation, Vernon conducted an employee evaluation of Sakhrani without consulting with the other shareholders with whom Sakhrani worked. The evaluation was Vernon's personal assessment of Sakhrani, and it did not accurately reflect the views of the other shareholders. It was critical of

Sakhrani on points unsupported by Sakhrani's fellow workers. This action caused a further deterioration in the working relationships among the small group of shareholders.

{50} The situation with respect to Vernon's and Williams' continued employment was further complicated by the post-termination conduct of Vernon and Williams. Vernon conducted a personal vendetta against Cuomo. Vernon wrote to the university where Cuomo had received his doctorate and accused him of plagiarizing his thesis. Vernon then wrote to N.C. State and made demands for extensive documents relating to Cuomo's relationship with the University. In a further effort to cause problems for Cuomo, Vernon also wrote to the Golden Leaf Foundation. Vernon's unjustifiable, spiteful actions were harmful to Cuomo and created an intolerable relationship between the two.

{51} After his termination, Williams attempted to obtain the trademark rights to TriboGlide and StaClear. His justification was to protect the names from loss since TriboFilm had not applied for protection. Williams could have achieved the same result by demanding that TriboFilm take action to protect its trade names. His actions clearly diminished any remaining trust among the parties.

{52} By their own conduct, Vernon and Williams made their continued employment at TriboFilm unrealistic, and ultimately justifying the Board of Directors' action in preventing them from working at TriboFilm.

{53} On November 3, 2005, acting on a Notice of Meeting sent on November 1, 2005, the Board of Directors held a special meeting where a majority of the directors (such majority consisted solely of the Individual Defendants) placed Vernon and Williams on administrative leave, changed the Company's locks, and barred them from the building.

{54} The Board of Directors held another special meeting on November 14, 2005, during which the directors voted to remove Vernon and Williams as officers of TriboFilm and terminated their employment. This meeting was immediately followed by a special meeting of the shareholders. At the shareholders meeting, a majority of the issued and outstanding shares of TriboFilm (such majority consisted

solely of the Individual Defendants) voted to remove Vernon and Williams from the Board of Directors.

{55}  As a result of the November 2005 meetings, Vernon and Williams were effectively divested of any and all management and control over TriboFilm's operations.

{56}  In early March 2006, the Individual Defendants attempted to acquire all of Plaintiffs' TriboFilm stock for $2,000.00 each ($0.01 per share).  Having been excluded from the business, Plaintiffs were in no position to evaluate the offer.

{57}  Later in March 2006, Vernon and Williams made a counteroffer to purchase all of Defendants' TriboFilm stock for $0.10 per share, ten (10) times the amount offered for Plaintiffs' shares.  Each Defendant rejected Plaintiffs' counteroffer.  Sakhrani testified that he would not have accepted a billion dollars for his shares.  Tomasino testified that the opportunity to do the research and development on TriboFilm's technologies was more valuable to him than selling his stock for $0.10 per share and that it was his belief that the other Individual Defendants felt the same way.

{58}  On or about June 7, 2006, shortly after the unsuccessful attempt to acquire Plaintiffs' interests in TriboFilm, the Individual Defendants voted themselves annual salaries or, in Sakhrani's case, a substantial salary increase, despite the fact that none of them other than Sakhrani had ever been a salaried employee of the Company.  TriboFilm had never had the resources necessary to pay salaries at the level the Individual Defendants approved for themselves.  Also, on or about June, 7, 2006, the Individual Defendants, citing TriboFilm's dire financial condition, voted to "defer" portions of the increased salaries.

{59}  The increased salaries were not necessary to keep the Individual Defendants working at TriboFilm, as each of them had non-monetary incentives to continue working, including the benefits that they would receive from completing the grants and by virtue of their already existing stock ownership.  Further, neither the manner in which the salaries were determined nor the expert testimony offered to support the salaries took into account the financial condition of the Company, the

fact that the "officers" were not supervising anyone other than themselves, or the nature of the work being done. Both Mineo and the Defendants' expert simply used the Individual Defendants' employment titles to compare salaries within the industry without truly analyzing the real work situation, the Company's ability to pay, and the startup nature of the venture. The salaries were unrealistic and inflated given TriboFilm's lack of funding, and they support a finding that the majority shareholders were not conducting the business affairs of the Company in the best interests of all the shareholders.

{60} The Individual Defendants did not disclose to Plaintiffs the salary increases or the vote to defer the increased salaries.

{61} On or about December 11, 2006, the Individual Defendants, acting as the only members of the Board of Directors, and without disclosure to Plaintiffs, voted to convert $15,000.00 of deferred salary into TriboFilm stock at a rate of $0.01 per share. That price per share was one-tenth of the price per share of Plaintiffs' arms-length offer in March 2006, an offer the Individual Defendants themselves had rejected. In addition, the Individual Defendants gave themselves dollar-for-dollar credit for the deferred salary even though the deferred salary had little to no actual monetary value. The Individual Defendants were the only persons that would benefit from this transaction.

{62} On or about December 21, 2006, the Individual Defendants, acting as the only members of the Board of Directors, recommended to the shareholders that they approve an amendment to the Articles of Incorporation increasing the number of authorized shares of TriboFilm stock from one (1) million to fifteen (15) million shares. The stated purpose of the additional shares was to raise additional capital and pay certain obligations of the Company. The resolution adopting the recommendation did not disclose the Individual Directors' plan to each exchange $15,000.00 of deferred salary for a portion of the newly authorized stock.

{63} On December 22, 2006, the Individual Defendants, acting as the only members of the Board of Directors, issued a notice of special shareholders meeting to vote on the amendment of TriboFilm's Articles of Incorporation to increase the

Company's authorized issue to fifteen (15) million shares. The meeting notice disclosed neither the reason for the request to increase the authorized shares, nor the Individual Defendants' plan to exchange $15,000.00 of deferred salary for a portion of the newly issued stock.

{64} At the special shareholders meeting on January 5, 2007, the Individual Defendants voted over Williams' and Vernon's objection to approve the amendment of TriboFilm's Articles of Incorporation to increase the number of authorized shares to fifteen (15) million. There was no discussion about, or disclosure of, the Individual Defendants' intent to exchange a portion of the deferred salary for a portion of the newly issued stock. At the meeting, the Individual Defendants offered no reason for the increase in the authorized issue other than to benefit the Company.

{65} On January 26, 2007, without disclosure to Plaintiffs, the Individual Defendants each transferred to themselves 1,500,000 shares of the newly authorized TriboFilm stock in exchange for the forgiveness of $15,000.00 of deferred salary. The transfer reduced Plaintiffs' percentage of the issued and outstanding stock of the Company from 20.2% each to 2.4% each. The transfer of stock to the Individual Defendants substantially diluted the percentage interests of Vernon and Williams in TriboFilm relative to the percentage interests of the Individual Defendants. The practical effect of the Individual Defendants' actions was to obtain a substantial part of Plaintiffs' interest in TriboFilm, an interest that the Individual Defendants had been unsuccessful in purchasing only nine (9) months earlier.

{66} At the time of the conversion of deferred salary for additional stock, the Individual Defendants' deferred salary had almost no value. Plaintiffs were not provided an opportunity to purchase any of the newly authorized TriboFilm stock. Williams requested in writing that he be issued shares of the newly authorized TriboFilm stock to maintain his equal percentage ownership with Cuomo and Sakhrani, but Williams never received a response to that request.

{67} Plaintiffs did not participate in the unreasonable salary increases and the resultant award of stock as payments for those increases. No one voted for the

salary increases that did not benefit from the vote in favor of the salary increases. Only the Individual Defendants were permitted to vote on the resolution approving the new salary structure, the resolution proposing the increase in the authorized issue of the Company, and the resolution converting a portion of their deferred salaries into stock. The Individual Defendants were interested parties in each of these transactions since they were the only parties to benefit from the actions taken by the Board of Directors.

{68} The Individual Defendants failed to establish the reasonableness of the deferred salaries and the reasonableness of the exchange of the deferred salaries for additional stock. This is especially true in light of the facts that the deferred salaries had little to no actual value and the exchange was done at one-tenth of the most recent arms-length offer for the stock.

{69} The stock exchange for deferred salary was not necessary to keep the Individual Defendants working at TriboFilm. Each of them had non-monetary incentives to continue working, particularly to get the patents issued.

{70} The undisclosed actions of the Individual Defendants—in unreasonably increasing their salaries, deferring the salaries, and subsequently exchanging a portion of the deferred salaries for newly issued stock—were self-dealing. The Individual Defendants' intended effect was to acquire Plaintiffs' interests in TriboFilm by substantially diluting their ownership interests. All of the shareholders had worked in this startup venture with the reasonable understanding that the ultimate benefit from their efforts would come from their stock ownership. Were the Court to sanction the Individual Defendants' action in diluting Williams' and Vernon's ownership interests, there would be no impediment to the Individual Defendants issuing more stock for debt and virtually eliminating any minority ownership.

{71} By letters dated November 8, 2005 and January 10, 2006, Plaintiffs served TriboFilm and its directors with demands to take corrective actions as required by N.C. Gen. Stat. § 55-7-42. Defendants did not take the corrective action demanded by Plaintiffs within the time allowed by the statute or, indeed, within any time.

{72} Vernon and Williams had reasonable expectations that their ownership percentage in TriboFilm in relation to the Individual Defendants' ownership percentage would not be changed without their consent. While the Bylaws and Articles of Incorporation did not prevent dilution, and startup companies often have to issue new stock to angel investors, Vernon and Williams could and did have a reasonable expectation that the majority shareholders would not dilute their ownership purely to benefit other shareholders.

{73} Williams had an expectation that he would maintain an ownership interest in TriboFilm equal to the ownership interests of Vernon, Cuomo and Sakhrani.

{74} Individual Plaintiffs' expectations with respect to their ownership were either known to or assumed by the other shareholders, officers, and directors of TriboFilm.

{75} Individual Plaintiffs' expectations with respect to their ownership, through no material fault of their own, were frustrated by the Individual Defendants.

{76} The Individual Defendants terminated Vernon and Williams from their employment with TriboFilm and divested them of their management and operational duties. Individual Defendants were justified in doing so based on the dysfunctional status of the Company. Reinstatement would not be in the best interest of the Company given the post-termination actions of Vernon and Williams and the disruption to the ongoing operation which would occur. Individual Defendants were not justified, however, in diluting Vernon's and Williams' ownership of TriboFilm.

{77} Individual Plaintiffs have been excluded from the future financial benefits of their original ownership if TriboFilm's technologies become successful. Those financial benefits may be substantial.

## CONCLUSIONS OF LAW

Based upon the foregoing Findings of Fact, this Court concludes as follows:

{78} While shareholders may hold reasonable expectations as a result of their

ownership of a small, closely held company, those expectations may be subverted to the overall business interest of the company or may become unsustainable under certain circumstances. At the outset of their involvement, Vernon and Williams had a reasonable expectation that they would continue to work with TriboFilm. That expectation ceased to be reasonable when the Company and the relationships among the shareholders became dysfunctional. It is undisputed on this record that by fall 2005, all trust among the parties had disappeared. The Company could not operate and fulfill its function. There was no communication or cooperation among the small group of researchers who were required to work closely together. A company is not required to fulfill once-reasonable expectations of continued employment where that employment may be detrimental to the ongoing survival of the business. Something had to be done to keep the Company alive and functioning. A majority of shareholders agreed on how to accomplish that goal. The majority was within its rights to terminate the employment of Vernon and Williams, and it did not breach a fiduciary duty by doing so under the circumstances that existed in this case. Termination of employment does not automatically trigger a right to dissolution or valuation under the statute. *See* N.C. Gen. Stat. § 55-14-30. Under some circumstances, however, it may support a finding that dissolution was necessary in order to protect the interests of all shareholders. Here, the terminations standing alone would not result in a forced dissolution because the contentious circumstances required some action and Individual Plaintiffs were not without fault in creating the contentious circumstances.

{79}   Directors are fiduciaries, and they may not use their position of trust to further their own private interest. *See Meiselman v. Meiselman*, 309 N.C. 279, 308, 307 S.E.2d 551, 568 (1983). To do so is a breach of the duty of loyalty. *See id.*

{80}   The series of transactions by which the Individual Defendants diluted the ownership of Williams and Vernon were transactions in which they had a direct financial interest. Consequently, the Individual Defendants were self-dealing.

{81}   The Individual Defendants are not entitled to the protection of N.C. Gen. Stat. § 55-8-31(a), which provides:

A conflict of interest transaction is a transaction with the corporation in which a director of the corporation has a direct or indirect interest. A conflict of interest transaction is not voidable by the corporation solely because of the director's interest in the transaction if any one of the following is true:

(1) The material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board of directors and the board of directors or committee authorized, approved, or ratified the transaction;

(2) The material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved, or ratified the transaction; or

(3) The transaction was fair to the corporation.

N.C. Gen. Stat. § 55-8-31(a).

{82} Here, none of the transactions were authorized, ratified, or approved by a majority of disinterested directors. The material facts were not disclosed to the shareholders; rather, they were deliberately hidden from the minority shareholders. The transaction was not fair to the corporation. The directors clearly received a personal financial benefit from the transactions they approved. Thus, they are not entitled to the benefit of the business judgment rule. *See Brehm v. Eisner*, 746 A.2d 244, 264 n.66 (Del. 2000) (stating that "directors' decisions will be respected by courts unless the directors are interested or lack independence relative to the decision . . . ."); *see also In re Brokers, Inc.*, 363 B.R. 458, 474 (2007); *see, e.g., Weiss v. Temporary Inv. Fund, Inc.*, 692 F.2d 928, 947 (3d Cir. 1982), *vacated and remanded on other grounds,* 465 U.S. 1001, 104 S. Ct. 989 (1984) ("Of course, the business judgment rule is inapplicable . . . when the directors' judgment . . . is the product of self-dealing . . . ."); *Joy v. North*, 692 F.2d 880, 886 (2d Cir. 1982), *cert. denied*, 460 U.S. 1051, 103 S. Ct. 1498 (1983) ("[The business judgment rule] does not apply in cases . . . tainted by a conflict of interest . . . ."); *In re Fleming Packaging Corp.*, 351 B.R. 626, 634 (Bankr. C.D. Ill. 2006) ("The protection . . . afforded by the business judgment rule does not apply where the plaintiff has made

an adequate showing that the directors breached their duty of loyalty . . . by having . . . engaged in self-dealing . . . ."); *In re Sheffield Steel Corp.*, 320 B.R. 405, 422 (Bankr. N.D. Okla. 2004) ("[A]llegations of self-dealing disrupt the usual presumption that directors have acted with reasonable business judgment."); *Behradrezaee v. Dashtara*, 910 A.2d 349, 363 (D.C. 2006) (finding that protections of the business judgment rule are only available to disinterested directors whose conduct otherwise meets the tests of business judgment).

{83}   Individual Defendants have breached their fiduciary duties to TriboFilm and to minority shareholders Vernon and Williams.  Furthermore, Individual Defendants have frustrated the reasonable expectations of Vernon and Williams in the following ways:

> a.   by awarding themselves unreasonable and improperly high salaries, without disclosure, knowing that the then current revenues of TriboFilm would not cover such salaries;

> b.   by deferring the unreasonably high salaries, without disclosure to Vernon or Williams, causing TriboFilm to incur substantial additional debt;

> c.   by recommending that TriboFilm increase the number of authorized shares to fifteen (15) million without disclosing to Vernon or Williams the reasons for increasing the number of shares;

> d.   by voting as majority shareholders to increase the number of authorized shares to fifteen (15) million without disclosing to Vernon or Williams the reasons for increasing the number of shares;

> e.   by each exchanging, without disclosure to Vernon or Williams, $15,000.00 of their deferred salary claims for TriboFilm stock at $0.01 per share (which was ten (10) times less than the most recent arms-length offer from Individual Plaintiffs nine (9) months earlier) at a time when the market value of their claims for deferred salary was at or near zero (0) in an attempt to acquire Williams' and Vernon's interests in TriboFilm without paying valuable consideration;

f. by diluting, without disclosure or consent, Williams' equal ownership interest in TriboFilm relative to the ownership interests of the Individual Defendants;

g. by diluting, without disclosure or consent, Vernon's equal ownership interest in TriboFilm relative to the ownership interests of the Individual Defendants;

h. by continually failing to disclose material facts relating to the acquisition of Individual Plaintiffs' interests in TriboFilm by the dilution of their ownership interests; and

i. by failing to act openly, honestly, and fairly in corporate governance matters and procedures.

{84} The above described actions constitute self-dealing by the Individual Defendants as directors, officers, and majority shareholders of TriboFilm. As such, the burden of proof was on the Individual Defendants to prove that the self-dealing transactions were fair, just, and reasonable. *See* N.C. Gen. Stat. § 55-8-31(a)-(d); *Alford v. Shaw*, 320 N.C. 465, 472–73, 358 S.E.2d 323, 327–28 (1987); *Lowder v. Allstar Mills, Inc.,* 103 N.C. App. 479, 482, 405 S.E.2d 794, 796 (1991). The Individual Defendants did not meet this burden.

{85} The exchange of worthless or discounted debt for more than one-third ownership in the Company is not fair to the Company or the shareholders. The fact that the individuals who benefited from the debt-for-stock exchange created the debt at a time when the Company was financially strapped and unable to pay the debt clearly indicates that a primary purpose was to dilute Vernon's and Williams' ownership. Individual Defendants' other explanations of why they created the debt are unconvincing. The secretive manner in which the manipulation occurred is further evidence of bad motive, and the manner in which the allocation occurred demonstrates that the majority shareholders had their personal interests in mind when they acted.

{86} Individual Defendants had options in 2006 if they did not wish to work for TriboFilm under circumstances in which Vernon and Williams owned forty (40)

percent of the Company. They could have easily engineered a squeeze-out merger that would have resulted in Vernon's and Williams' shares being subject to appraisal based on their value at that time. *See* N.C. Gen. Stat. § 55-13-02(a)(1). They did not do so. Rather, they gambled that they could virtually eliminate Vernon's and Williams' ownership by their manipulation of both compensation and debt. If they were successful, they stood to receive a far greater percentage of the ultimate value of TriboFilm. If they were unsuccessful, they would be in the same position they were in before because, if the Court ordered dissolution pursuant to N.C. Gen. Stat. § 55-14-30(2)(ii), the Company could elect to have the Vernon and Williams shares valued under N.C. Gen. Stat. § 55-14-31(d), and the Company could purchase the shares at the valued amount. The only costs associated with their dilution efforts were legal fees and the possibility that the value of the Company had increased.

{87} Williams failed to present sufficient evidence to establish a contract for commissions owed.

{88} The Individual Defendants' salary increases were unreasonable under the circumstances in which they were implemented and for the purposes for which they were ultimately used.

{89} Equity requires that the issuance of additional shares to the Individual Defendants be rescinded and Vernon and Williams be restored to their previous 20.2 ownership percentage.

{90} The Court concludes that the circumstances existing at the time of Vernon's and Williams' termination do not support dissolution under the peculiar facts of this case.

{91} The Court concludes that the attempted dilution of the minority ownership was a breach of a fiduciary duty supporting invocation of the statutory procedure for dissolution of the Company and, if necessary, valuation of Vernon's and Williams' shares. *See* N.C. Gen. Stat. § 55-14-30(2)(ii); *see also* N.C. Gen. Stat. § 55-14-31(d); *Royals v. Piedmont Elec. Repair Co.*, 1999 NCBC 1, ¶¶ 38-63 (N.C. Super. Ct. Mar. 3, 1999), http://www.ncbusinesscourt.net/opinions/1999%20NCBC%201.htm

(detailing the analysis for liquidation and valuation based on N.C. Gen. Stat. § 55-14-30(2)(ii) and N.C. Gen. Stat. § 55-14-30(d)). While the Court recognized the need to cure the dysfunctional state in which the Company found itself, the fact that the majority shareholders, after having terminated the minority shareholders, would then attempt to dilute the minority shareholders' ownership in so significant a way and with no other significant benefit other than to increase their own ownership demonstrates that the majority is not operating, and will not operate, the Company in the best interest of all the shareholders.

{92} There was insufficient evidence to support Plaintiffs' claims that Individual Defendants mismanaged TriboFilm's grants or its business. To the contrary, TriboFilm stands on the verge of commercial success.

{93} The Court has directed a verdict on Plaintiffs' claims for diversion of corporate opportunity.

## CONCLUSION

{94} Based on the foregoing, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED**:

1. The shares issued to the Individual Defendants for debt shall be returned to TriboFilm.

2. The Court sets aside the dilution of Vernon's stock and reinstates him to his 20.2 ownership percentage.

3. The Court sets aside the dilution of Williams' stock and reinstates him to his 20.2 ownership percentage.

4. The Company shall be dissolved pursuant to N.C. Gen. Stat. § 55-14-30(2)(ii).

5. TriboFilm shall have ten (10) days from the date of this Order to notify the Court of its election to purchase the shares of Vernon and Williams at fair value. If it so elects, the parties will have thirty (30) days from the date of this Order to agree upon a Court appointed valuation expert and the terms of his engagement. Absent agreement, the parties will have (90) days from the date of this order to complete discovery on valuation issues.

6. The Court will specify the procedure to determine fair value.

7. In the event TriboFilm elects not to pursue purchase of the Vernon and Williams shares, the parties will have thirty (30) days from the date of this Order to submit recommendations for a receiver to liquidate the company.

**IT IS SO ORDERED**, this 17th day of March, 2009.