Thomas v. McMahon, 2015 NCBC 64.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

DONNY THOMAS and
SANDRA MOORE THOMAS,

        Plaintiffs,

v.

BYRON McMAHON and
WINFORGE, INC.,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
08 CVS 24887

**VERDICT AND FINAL JUDGMENT**

        **THIS MATTER** came before the Court on February 2, 2015, for trial pursuant to a Notice of Jury Trial issued on November 14, 2014.

        Plaintiffs Donny Thomas ("Mr. Thomas") and Sandra Moore Thomas (Ms. Thomas") (collectively, "Plaintiffs" or "the Thomases") were represented by Joe Millsaps and Ashley Bratton of Millsaps & Bratton, PLLC. Defendant Byron McMahon ("Mr. McMahon") (collectively with Plaintiffs, "the Parties") did not appear at trial and was unrepresented.[1] As explained in detail below, the Court concluded at trial that Mr. McMahon had been provided ample notice of the scheduled trial, had not requested a continuance of the trial, had not informed the Court of any good faith basis for his failure to appear at trial, and had not otherwise provided any reason why the trial should not go forward as noticed. The Court further concluded that Mr. McMahon, by his failure to appear in these circumstances, had waived his right to a jury trial. Plaintiffs advised the Court in their pretrial submissions and again at trial that they waived their right to a jury

---

[1] Plaintiffs have brought several claims derivatively on behalf of Defendant Winforge, Inc. ("Winforge") and have sued Winforge solely as a nominal defendant. Winforge did not separately appear at trial and was not independently represented. The Court concludes, and concluded at the trial, that Winforge, as a nominal defendant, was not required to appear in its independent capacity at trial in the circumstances here. *See, e.g.*, *Swenson v. Thibaut*, 39 N.C. App. 77, 101, 250 S.E.2d 279, 294 (1978) ("[E]xcept to the extent that the corporation is an actual defendant as to an issue in the action . . . the corporation . . . may not defend itself against the derivative action on the merits and must limit its defenses, if any, to the pretrial matters proper to it.").

trial. Accordingly, Plaintiffs' claims proceeded to a bench trial before the undersigned on February 2, 2015.[2]

Based upon live testimony, documentary evidence, and the pleadings offered by Plaintiffs at the trial of this matter, the Court makes the following findings of fact:

## FINDINGS OF FACT

A. <u>Waiver of Jury Trial</u>

{1}    Plaintiffs requested a jury trial in their Amended Complaint filed on August 2, 2010. Mr. McMahon requested a jury trial in his Answer filed on October 4, 2010.

{2}    Mr. McMahon was represented by John Bowers of Horack, Talley, Pharr & Lowndes, P.A. ("Mr. Bowers") until this Court (Murphy, J.) permitted Mr. Bowers to withdraw as Mr. McMahon's counsel by Order dated August 21, 2013 ("August 21, 2013 Order"). Also in the August 21, 2013 Order, the Court effectively stayed activity in the case to permit Mr. McMahon a period of forty-five (45) days to find replacement counsel and ruled that because Mr. McMahon then had no physical address in the United States and was traveling internationally in search of employment, correspondence to Mr. McMahon's email addresses would constitute proper notice to and service on Mr. McMahon until such time as he elected to secure new counsel. Since the entry of the August 21, 2013 Order, Mr. McMahon has regularly communicated with the Court by email. He has never objected to communication by e-mail, has never requested communication by any other form, has never provided a physical address for the Court to use for alternative or additional notification, and is aware of and has had regular access to the Court's various orders and Plaintiffs' filings through access to the Court's website. Despite the Court's accommodation of Mr. McMahon's efforts to retain new counsel, no counsel has entered an appearance as counsel of record for Mr. McMahon at any time after entry of the August 21, 2013 Order.

---

[2] The Court concludes, and concluded at the trial, that because Winforge was a nominal defendant, it was not necessary to obtain Winforge's consent to waive a jury trial in these circumstances. *See generally, e.g.*, *Swenson*, 39 N.C. App. at 101, 250 S.E.2d at 294.

{3}     On December 6, 2013, Mr. McMahon, acting *pro se*, filed a motion for summary judgment and, on April 9, 2014, attended a hearing on the motion at the Mecklenburg County Courthouse.  Mr. McMahon also appeared, again acting *pro se*, at a status conference held in this case at the Mecklenburg County Courthouse on July 24, 2014.  At the status conference, the Court ordered the parties to conduct a mediation in the case on or before September 22, 2014 and directed Mr. McMahon to notify the Court in writing on or before that date whether he consented to a bench trial.  By email dated September 25, 2014, Mr. McMahon notified the Court and opposing counsel that he did not consent to a bench trial.

{4}     After sending numerous emails inquiring of Mr. McMahon's availability for a jury trial to begin on February 2, 2015 and receiving no response from Mr. McMahon, the Court emailed the parties again on November 13, 2014 to indicate the Court's intention to schedule this matter for trial to begin on February 2, 2015.  Mr. McMahon responded to the Court's email on November 13, 2014, and noted his receipt of the Court's message, thereby acknowledging that he was on notice that the Court intended to schedule this matter for trial on February 2, 2015.

{5}     The Court issued a Notice of Jury Trial on November 14, 2014, setting this matter for trial to begin at 10:00 AM on February 2, 2015, in Courtroom 6370 of the Mecklenburg County Courthouse.  Three days later, on November 17, 2014, the Court entered a Notice of Pretrial Conference and Pretrial Order.  The Notice of Pretrial Conference stated that the Court would hold a pretrial conference at 10:00 AM on January 22, 2015, in Courtroom 6370 of the Mecklenburg County Courthouse.  The Pretrial Order set numerous deadlines for submission of pretrial materials to the Court.  The Notice of Jury Trial, Notice of Pretrial Conference, and Pretrial Order were each uploaded to the Business Court's e-filing docket, and Plaintiffs and Mr. McMahon were sent notices of filing to their registered email accounts, including, for Mr. McMahon, to the email addresses he most recently used in his email communications with the Court and which were referenced in the Court's August 21, 2013 Order.

{6}     Mr. McMahon did not file any of the pretrial submissions required in the Pretrial Order and failed to appear at the pretrial conference on January 22, 2015. Shortly after the pretrial conference concluded, the Court sent Mr. McMahon an email at 10:30 AM on January 22, 2015, requesting that Mr. McMahon notify the Court whether he planned to attend the trial scheduled to begin on February 2, 2015, at the Mecklenburg County Courthouse. Mr. McMahon did not respond.

{7}     Mr. McMahon did not appear for trial on February 2, 2015, and no counsel or other representative appeared or was present on his behalf. Mr. McMahon did not request a continuance of the trial or inform the Court of any good faith basis for his failure to appear at trial. The Court concluded that under the authority of *Sykes v. Belk*, 278 N.C. 106, 179 S.E.2d 439 (1971) ("a party may waive his right to jury trial by (1) failing to appear at the trial . . .") and *Frissell v. Frissell*, 47 N.C. App. 149, 266 S.E.2d 886 (1980) ("a party may waive his right to jury trial by failing to appear at trial"), Mr. McMahon had waived his right to a jury trial by failing to participate voluntarily in the trial of this matter.

{8}     Plaintiffs indicated their waiver of their right to jury trial at the pretrial conference on January 22, 2015, and again indicated their preference that this matter be decided by the Court sitting without a jury in Plaintiffs' Pretrial Memorandum submitted on January 27, 2015. Plaintiffs personally appeared at trial and, through counsel, again orally stipulated to a trial of this matter by the Court sitting without a jury.

{9}     Based on the foregoing, the Court concluded that all Parties waived their right to a jury trial and, as a result, determined that it was proper to proceed with a bench trial.

{10}    The Court therefore finds that (i) the Notice of Jury Trial issued on November 14, 2014 was properly served on Mr. McMahon, (ii) Mr. McMahon received adequate and proper notice of the trial of this matter, (iii) the Court has personal jurisdiction over Mr. McMahon, (iv) the Parties waived their right to a jury trial in this matter, and (v) it was proper to proceed with trial before the Court without a jury.

B. <u>The Hotel Project</u>

{11}  Plaintiffs are husband and wife and at all relevant times lived in Knoxville, Tennessee.  Mr. McMahon was a resident of Mecklenburg County, North Carolina at the time this action was filed but now resides out of the country. Nominal Defendant Winforge, Inc. is a corporation organized under the laws of the State of North Carolina.

{12}  In 1999, Plaintiffs purchased a 3.3 acre undeveloped tract of land in Pigeon Forge, Tennessee located on a parkway containing restaurants, hotels, motels, and other attractions ("the Land").  By 2002, Plaintiffs owned and operated an O'Charley's Restaurant on 1.1 acres of the Land (the "Developed Parcel"), and had begun to actively consider building a hotel on the remaining 2.2 acres of undeveloped land ("the Undeveloped Parcel").  Mr. Thomas had been involved in the furniture business for many years, however, and neither he nor Ms. Thomas were sophisticated businesspersons or had any prior experience with hotel franchising, development or construction.  As a result, Mr. Thomas contacted a number of experienced hotel development companies, including Cendant Corporation ("Cendant"), then the owner of several hotel brands including Wingate Incorporated ("Wingate"), to discuss a possible collaboration to develop the Undeveloped Parcel. Cendant put Mr. Thomas in contact with Mr. McMahon, who held himself out to Plaintiffs as an experienced hotel developer and who at that time was an existing Wingate franchisee, the owner of a number of Wingate hotels, and one of eight members of Cendant's world-wide preferred client group.

{13}  Plaintiffs and Mr. McMahon entered into a verbal agreement in September 2003 to develop and build a hotel under the Wingate franchise that contained the following essential terms (the "Agreement"):

    a. The parties agreed to establish a North Carolina corporation – Winforge – in which Plaintiffs would each own a 10% interest and Mr. McMahon would own an 80% interest.

    b. Plaintiffs agreed to convey to Winforge clear fee simple title to the Undeveloped Parcel at an agreed-upon total value of $1,367,257.85

and, after deducting Plaintiffs' debt secured by the Undeveloped Parcel, at an agreed-upon equity value of $1,000,000.00.[3]

    c. Mr. McMahon agreed to contribute $10.00 to Winforge, assume personal responsibility for the development and construction of a Wingate brand hotel on the Undeveloped Parcel, and obtain and personally guarantee a line of credit for Winforge from Coachman Industries of Indiana ("Coachman") in the total amount of $4,928,989.00 (the "Coachman Loan").

    d. The Parties agreed that part of the Coachman Loan would be used to pay off Plaintiffs' mortgage on the Undeveloped Parcel in the total amount of $367,257.85 ("Plaintiffs' Mortgage") and that the Coachman Loan would be secured by the Undeveloped Parcel.

{14} Prior to their entry into the Agreement, Mr. Thomas provided Mr. McMahon a set of "stick built" hotel construction plans that another hotel developer had prepared for Mr. Thomas that were 90% complete and intended to comply with the requirements of the Wingate brand. It was Plaintiffs' reasonable understanding and expectation that the Wingate hotel that Mr. McMahon agreed to build on the Undeveloped Parcel would be consistent with and substantially similar to the hotel contemplated by these plans and would fully comply with the requirements established by the Wingate brand.

{15} Mr. McMahon induced Plaintiffs to enter into the Agreement, in part, by representing to them that the hotel would be constructed within a reasonable amount of time, Plaintiffs would receive annual income of approximately $50,000.00 for the next 20 to 30 years as their 20% share of Winforge's annual profits, and, based on a January 28, 2003 appraisal commissioned by Mr. McMahon of the "as built" hotel, the completed hotel would have a value of $7,700,000.00 in January

---

[3] No evidence was introduced at trial suggesting that Plaintiffs had any obligation to make, or in fact made, a monetary contribution to Winforge at any time.

2008, indicating that Plaintiffs could expect the value of their 20% interest to grow to over $1,500,000 in less than five years.[4]

{16} In accordance with the Agreement, the Parties formed Winforge on July 18, 2003. Thereafter, on April 5, 2004, Plaintiffs conveyed title to the Undeveloped Parcel to Winforge. That same day, Mr. McMahon obtained and personally guaranteed the Coachman Loan, which was secured by the Undeveloped Parcel, and used the Coachman Loan to pay off Plaintiffs' Mortgage.

{17} Mr. McMahon served in the roles of president, secretary, director, and registered agent of Winforge. Mr. Thomas was appointed a director of Winforge, but did not otherwise participate in the management or decision-making process of Winforge. Winforge did not hold board of directors meetings, and Mr. McMahon did not seek Mr. Thomas's assistance in the management of Winforge at any time. Plaintiffs reasonably believed, and Mr. McMahon reasonably understood, that Mr. McMahon would undertake management responsibility for Winforge and that Plaintiffs' involvement with Winforge would be limited to providing Winforge the Undeveloped Parcel for development. The parties understood that Plaintiffs were not expected to take, and in fact did not take, any other actions in furtherance of Winforge's activities. Under the particular circumstances of this case, and in particular because of Mr. McMahon's 80% majority ownership status in Winforge, Plaintiffs' limited involvement in Winforge, and Mr. McMahon's representations to Plaintiffs concerning his substantial experience as the developer, builder, owner and operator of numerous hotel properties, Plaintiffs reasonably placed a special trust and confidence in Mr. McMahon and depended upon him entirely concerning the development and construction of the Wingate hotel on the Undeveloped Parcel.

{18} Between April 5, 2004 and December 16, 2005, Mr. McMahon, on behalf of Winforge, drew down approximately $2,300,000.00 on the Coachman Loan, causing Winforge to become indebted to Coachman in that amount. Mr. McMahon directed over $1,186,043.70 of the Coachman Loan proceeds to be paid directly to himself or

---

[4] Ms. Thomas had limited interaction with Mr. McMahon and limited input regarding the formation of Winforge and the construction of the Wingate hotel. She largely relied on Mr. Thomas's recommendations and guidance regarding the terms of the Agreement.

to his wholly-owned business entity, Matrix Development Corporation ("Matrix"), or to Flagship Development ("Flagship") and Lee and Associates ("L&A"), companies owned by a business associate of Mr. McMahon, Michael Lee.

{19} More specifically, Mr. McMahon caused Winforge to pay himself a $67,000.00 general contractor fee for the hotel project, even though Mr. McMahon had no experience as a general contractor, was not a licensed general contractor in the State of Tennessee, and had no experience building a hotel using modular units. In addition, Mr. McMahon caused Winforge to buy over $850,000.00 worth of furniture, fixtures, and accessories for the interior of the never-built hotel; spend approximately $75,000.00 for grading the site; and pay over $624,000.00 in development and other fees to Matrix, Flagship or L&A.

{20} In causing Winforge to pay out fees and expenses to himself and others in the amount of approximately $2,300,000.00, Mr. McMahon failed to perform his duties to Plaintiffs and Winforge in a number of significant and fundamental respects and took advantage of the special trust and confidence Plaintiffs had reasonably placed in him.

{21} First, although fully aware of his own plans, Mr. McMahon did not inform Plaintiffs prior to entering the Agreement that he intended to construct the hotel using modular units, then a relatively novel and unproven building technique for hotel construction, rather than employing standard or conventional "stick-built" construction. The facts proven at trial established that Mr. McMahon decided to use the Winforge hotel as an experiment in modular construction and did not advise Plaintiffs of his plans until one or two weeks after Plaintiffs transferred title to the Undeveloped Parcel and Winforge had taken other actions in furtherance of Mr. McMahon's modular construction plans. Mr. McMahon failed to disclose his plans to Plaintiffs even though Mr. Thomas had provided Mr. McMahon hotel construction plans for a "stick built" Wingate hotel that were 90% complete to assist in the hotel project, and Mr. McMahon knew that Plaintiffs reasonably expected that the Wingate hotel to be built on the Undeveloped Parcel would be of "stick-built" construction. The facts presented at trial further established that had Mr.

McMahon advised Plaintiffs of his plan to use modular construction prior to the Parties' entry into the Agreement, Plaintiffs would not have entered into the Agreement, agreed to create Winforge, or conveyed the Undeveloped Parcel to Winforge.

{22} In addition, in order to obtain a proper building permit so that construction could begin, the City of Pigeon Forge, Tennessee required all project owners, including Winforge in connection with this project, to retain and identify a general contractor and an architect, each licensed in the State of Tennessee. Similarly, although the State of Tennessee approved Winforge's modular construction plans, and Mr. McMahon commissioned two companies, Mod-U-Kraf, LLC ("Mod-U-Kraf") and All American Homes, LLC ("All American"), to build modular units for use in the contemplated hotel, the modular units could not be constructed under Tennessee law without a licensed architect's design and approval.

{23} Based on the facts proven at trial, Mr. McMahon was aware that hiring a licensed general contractor and a licensed architect, obtaining a building permit from the City of Pigeon Forge, and obtaining certain approvals from the State of Tennessee were necessary and required conditions precedent to Winforge's right to construct the Wingate hotel in accordance with the Agreement.

{24} Mr. McMahon, however, never caused Winforge to hire a duly licensed general contractor or architect, and, as a result, the City of Pigeon Forge, Tennessee never issued a building permit, the State of Tennessee refused to issue modular unit design approvals, and the project therefore did not go forward. Indeed, the foundation of the contemplated hotel was never laid, no modular units were ever constructed, and no hotel or modular unit construction, other than grading, occurred at any time. Because Mr. McMahon agreed under the Agreement to assume personal responsibility for the development and construction of the hotel, Mr. McMahon was individually responsible for hiring the duly-licensed general contractor and architect and obtaining the building permit and other necessary approvals on behalf of Winforge. The facts proven at trial established that Mr.

McMahon knowingly and intentionally failed to hire a licensed architect and general contractor and knowingly and intentionally failed to obtain the necessary building permit and other approvals required for the construction of the contemplated Wingate hotel.

{25} The Court further finds that because the hotel was never constructed, Winforge never received revenue from the hotel project and was therefore unable to make required payments under the Coachman Loan.[5] As a result, Coachman declared Winforge in default under the Coachman Loan and demanded that the Loan be repaid in full. When Winforge failed to repay the approximately $2,300,000.00 advanced under the Loan, Coachman foreclosed on the Undeveloped Parcel on November 15, 2006 and took title to the Undeveloped Parcel from Winforge.

{26} The Court takes judicial notice that Winforge and Mr. McMahon subsequently filed suit against Coachman, Mod-U-Kraf, and All American Homes (the "Coachman Defendants") in the United States District Court for the Southern District of Indiana, Case Number 1:06-cv-00619-SEB-WGH, seeking to hold the Coachman Defendants liable for Winforge's failure to construct the hotel and to recover damages (the "Indiana Action"). United States District Court Judge Sarah Evans Barker concluded that Winforge's failure to construct the hotel was ultimately due to Mr. McMahon's delay in obtaining the necessary permits and plan approvals and ordered that Coachman was entitled to recover $2,347,587.31, plus $292,486.15 in interest and attorneys' fees, from Winforge. Plaintiffs were not parties to the Indiana Action.[6]

---

[5] No evidence was introduced at trial that Plaintiffs were obligated to make, or in fact ever made, any payments on the Coachman Loan.

[6] Pursuant to Plaintiffs' request, the Court takes judicial notice of the fact that the Indiana Action was filed and that Judge Baker reached certain conclusions. *See* N.C. Rule of Evidence 201. In addition to judicial notice, however, Plaintiffs urge the Court to apply the doctrine of offensive collateral estoppel and adopt Judge Baker's factual findings in the Indiana Action concerning Mr. McMahon's responsibility for causing the Coachman Loan default. Although the Court recognizes that the North Carolina courts have adopted the use of non-mutual offensive collateral estoppel in appropriate circumstances, *see, e.g.*, *Rymer v. Sorrells*, 127 N.C. App. 266, 488 S.E.2d 838 (1997), the Court does not find it necessary to do so in deciding this case and thus elects not to consider Judge Baker's factual findings here.

{27} By letter dated June 18, 2008, Plaintiffs served a demand on Mr. McMahon, as President of Winforge, requesting that he cause Winforge to bring an action against himself for his alleged breaches of fiduciary duty to Winforge. Mr. McMahon did not respond to Plaintiffs' demand. After expiration of the 90-day notice period under N.C.G.S. § 55-7-42, Plaintiffs filed suit in Mecklenburg County Superior Court on November 7, 2008.[7]

{28} The Court finds that Plaintiffs suffered financial injuries and damages as a proximate result of Mr. McMahon's unlawful conduct in the total amount of $1,000,000.00 ("Compensatory Damages"), which represents the agreed-upon equity value of the Undeveloped Parcel at the time Plaintiffs entered into the Agreement and transferred title to the Undeveloped Parcel to Winforge.

{29} The Court further finds that the date of Mr. McMahon's breach of the Agreement is November 15, 2006, which is the date the Undeveloped Property went into foreclosure and Plaintiffs' injury became apparent to Plaintiffs. *See, e.g.*, *Liptrap v. City of High Point*, 128 N.C. App. 353, 355, 496 S.E.2d 817, 819, *disc. review denied*, 348 N.C. 73, 505 S.E.2d 873 (1998). The Court calculates prejudgment interest on Plaintiffs' Compensatory Damages at the legal rate under N.C.G.S. § 24-1 from the date of breach of the Agreement to be $688,202.40.

{30} Plaintiffs did not introduce competent evidence at trial showing that either of them, whether directly, or indirectly as shareholders of Winforge, suffered injuries and damages as a proximate result of Mr. McMahon's failure to cause Winforge to repay the Coachman Loan, except for the loss of the Undeveloped Property, and the Court therefore so finds.

Based upon the foregoing Findings of Fact, the Court reaches the following conclusions of law:

---

[7] On June 8, 2009, Plaintiffs obtained a default judgment against Mr. McMahon for $1,000,000.000, and Winforge obtained a default judgment against Mr. McMahon in the amount of $2,300,000.00. Plaintiffs' default judgment against Mr. McMahon was set aside on July 8, 2010.

## CONCLUSIONS OF LAW

{1}    This Court has jurisdiction to hear and decide this matter.

{2}    This Court has jurisdiction over all the parties to this matter.

{3}    Plaintiffs have standing to bring this action derivatively on behalf of Winforge as well as individually.

{4}    Mr. McMahon received proper, prior notice and had an opportunity to present defenses at the bench trial of this matter.  He voluntarily chose not to participate or put on any evidence or argument in his own defense.  Mr. McMahon thereby waived his right to a trial by jury.

{5}    Plaintiffs tendered Exhibits 1–11 at trial, which the Court admits into evidence for purposes of this bench trial.[8]

{6}    A derivative action is "a civil action brought by the shareholder 'in the right of' a corporation, N.C. Gen. Stat. § 55-7-40.1 (1999), while an individual action is one a shareholder brings to enforce a right which belongs to him personally." *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 395, 537 S.E.2d 248, 253 (2000).  As a general rule, shareholders lack standing to bring individual causes of action to enforce actions accruing to the corporation. *See, e.g., Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997).

{7}    The North Carolina Supreme Court has recognized two exceptions to this general rule, holding that "shareholders, creditors and guarantors may bring an individual action against a third party for breach of fiduciary duty when (1) 'the wrongdoer owed [them] a special duty' or (2) they suffered a personal injury 'distinct from the injury sustained by . . . the corporation itself.'" *Green v. Freeman*, 367 N.C. 136, 142, 749 S.E.2d 262, 268 (2013) (quoting *Barger*, 346 N.C. at 659, 488 S.E.2d at 219). "The existence of a special duty thus would be established by facts showing that defendants owed a duty to plaintiffs that was personal to plaintiffs as

---

[8] The Court notes that our appellate courts will assume the trial court did not consider incompetent evidence during a bench trial. *Bizzell v. Bizzell*, 247 N.C. 590, 605, 101 S.E.2d 668, 678 (1958) (in a bench trial, "it is presumed that incompetent evidence was disregarded by the court in making up its decision").

shareholders and was separate and distinct from the duty defendants owed the corporation." *Barger*, 346 N.C. at 659, 488 S.E.2d at 220.

{8}     Our courts have held that a special duty will exist "when the wrongful actions of a party induced an individual to become a shareholder." *Id.; see Howell v. Fisher*, 49 N.C. App. 488, 498, 272 S.E.2d 19, 26 (1980).

{9}     Our courts have also found that a special duty will exist in limited circumstances where a majority shareholder in a close corporation exercises such substantial control over the affairs of the corporation that a derivative action does not fairly address the wrongs the minority shareholder seeks to redress. Thus, "minority shareholders in a closely held corporation[9] who allege wrongful conduct and corruption against the majority shareholders in the corporation may bring an individual action against those shareholders, in addition to maintaining a derivative action on behalf of the corporation." *Norman,* 140 N.C. App. at 405, 537 S.E.2d at 259; *see also Willard v. Davenport*, 166 N.C. App. 129, 138, 601 S.E.2d 319, 325 (2004) (denying majority "and dominating" shareholder's motion to dismiss minority shareholder's direct action against him). In such circumstances, our courts have noted that "disposition of the recovery in a derivative action based on wrongdoing by the directors of a corporation would be under the control of the wrongdoers, unless a court exercised its equitable discretion by 'directing an individual recovery in order to achieve a fair distribution of the proceeds of the action.'" *Norman*, 140 N.C. App. at 405, 537 S.E.2d at 259 (quoting Russell M. Robinson, II, *Robinson On North Carolina Corporation Law* § 17-2(c) at 336 (5th ed. 1995). As a result, our courts have held that

> [i]f a corporation is closely held . . ., the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation . . . to a multiplicity of

---

[9] "A close corporation is a 'corporate entity typically organized by an individual, or a group of individuals, seeking the recognized advantages of incorporation, limited liability, perpetual existence and easy transferability of interests – but regarding themselves basically as partners and seeking veto powers as among themselves much more akin to the partnership relation than to the statutory scheme of representative corporate government.'" *Meiselman v. Meiselman*, 309 N.C. 279, 289, 307 S.E.2d 551, 557 (1983).

actions, (ii) materially prejudice the interests of creditors in the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.

*Id.* at 401, 537 S.E.2d at 256.

{10}   The Court finds that Winforge is a close corporation, consisting of three shareholders: Mr. McMahon, Mr. Thomas, and Ms. Thomas.   The Court further finds that Mr. McMahon induced Plaintiffs to become shareholders of Winforge and to contribute the Undeveloped Parcel to the corporation by promising to develop and build a hotel on the property – a hotel Mr. McMahon knew would be of modular construction at a time when Mr. McMahon knew Plaintiffs understood and intended that the hotel would be of "stick built" construction and at a time when Mr. McMahon knew Plaintiffs would not have entered into the Agreement, contributed the Undeveloped Parcel, and become shareholders of Winforge had Plaintiffs known Mr. McMahon's true plans for the construction of the contemplated hotel.  As such, the Court concludes that Mr. McMahon owed Plaintiffs a special duty that was "personal to plaintiffs as shareholders and was separate and distinct from the duty defendants owed the corporation," *Barger*, 346 N.C. at 659, 488 S.E.2d at 220, and that therefore Plaintiffs may maintain an individual action against Mr. McMahon. *See, e.g., Howell,* 49 N.C. App. at 498, 272 S.E.2d at 26.

{11}   In addition, the Court finds that after contributing the Undeveloped Parcel to Winforge, Plaintiffs have essentially been passive minority investors in Winforge and have reasonably relied on Mr. McMahon to manage and operate the corporation and develop a Wingate hotel on the property that they contributed to Winforge.  The Court concludes that on the facts here – where Mr. McMahon owns 80% of the corporation's shares, exercised total control over the management and operations of the corporation, and induced Plaintiffs to place special trust and confidence in him to build a Wingate hotel on the Undeveloped Parcel – Plaintiffs may, as minority shareholders alleging wrongful conduct and corruption against the majority shareholder, maintain an individual action against Mr. McMahon.  The Court further concludes that, on these particular facts, to permit Winforge to recover for Mr. McMahon's unlawful conduct here, where Winforge has ceased operations and

is effectively defunct, Mr. McMahon retains an 80% interest in the corporation, and Plaintiffs continue to hold 20% of the corporation's shares, would be unfair and unjust. The Court therefore, in its discretion, elects to treat Plaintiffs' derivative claims as direct claims and to order individual recovery to Plaintiffs in order to ensure a fair and just distribution of the proceeds in this matter. The Court finds that to do so will not unfairly expose Winforge to a multiplicity of actions, materially prejudice the interests of creditors of Winforge, or interfere with a fair distribution of the recovery among all interested persons, as all three shareholders of Winforge are parties to this action.

A. First Claim for Relief — Breach of Contract

{12}  In North Carolina, a claim for breach of contract requires "(1) existence of a valid contract, and (2) breach of the terms of that contract." *Toomer v. Garrett*, 155 N.C. App. 462, 481, 574 S.E.2d 76, 91 (2002).

{13}  To constitute an enforceable "verbal agreement, the parties must express themselves in such terms that the Court can ascertain to a reasonable degree of certainty what they intended by their agreement." *F. Industries, Inc. v. Cox*, 45 N.C. App. 595, 599, 263 S.E.2d 791, 793 (1980).

{14}  "A breach of contract occurs when a party fails to perform a contractual duty which has become absolute." *Salvaggio v. New Breed Transfer Corp.*, 150 N.C. App. 688, 692, 564 S.E.2d 641, 644 (2002).

{15}  The Agreement was a valid and enforceable contract between Plaintiffs and Mr. McMahon.

{16}  Mr. McMahon's failure to cause Winforge to take the necessary steps to develop and construct a Wingate hotel on the Undeveloped Parcel – specifically hiring a licensed general contractor, hiring a licensed architect, obtaining proper building permits, and obtaining necessary modular unit construction approvals – constituted a breach of the Agreement, thereby causing Plaintiffs financial harm.

{17}  Based upon the foregoing, the Court concludes that Plaintiffs' claim for breach of contract has been established against Mr. McMahon, and Plaintiffs are

entitled to compensatory damages as a result, the precise amount of which is detailed below.

B. Second Claim for Relief — Breach of Fiduciary Duty

{18}   The elements of a claim for breach of fiduciary duty are: (1) the existence of a fiduciary duty, (2) the breach of that duty, and (3) damages as a result of the breach of that duty. *See Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013). Corporate officers have a duty to "act in a manner that they reasonably believe to be in the best interests of the corporation" and "refrain from self-dealing transactions." *Brady v. Prince*, 2015 NCBC 2 ¶ 47 (N.C. Super. Ct. Jan. 7, 2015), www.ncbusinesscourt.net/opinions/2015_NCBC_2.pdf. Directors must also act in good faith and with due care, *Green*, 367 N.C. at 141, 749 S.E.2d at 268, and "may not use their position of trust to further their own private interest," *Vernon v. Cuomo*, 2009 NCBC 6 ¶ 79 (N.C. Super. Ct. Mar. 17, 2009), www.ncbusinesscourt.net/opinions/2009_NCBC_6.pdf.

{19}   Moreover, in closely-held corporations,

> [t]he devolution of unlimited power imposes on holders of the majority of the stock a correlative duty, the duty of a fiduciary or agent, to the holders of the minority of the stock, who can act only through them -- the duty to exercise good faith, care, and diligence to make the property of the corporation produce the largest possible amount, to protect the interests of the holders of the minority of the stock, and to secure and pay over to them their just proportion of the income and of the proceeds of the corporate property. . . . It is the fact of control of the common property held and exercised, and not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation on the party of the majority stockholders in a corporation for the minority holders. Actual fraud or mismanagement, therefore, is not essential to the application of the rule.

*Loy v. Lorm Corp.*, 52 N.C. App. 428, 432–33, 278 S.E.2d 897, 901, (1981).

{20}   As president, secretary, and a director of Winforge, Mr. McMahon owed a fiduciary duty to Winforge to act in good faith, with due care, and in a manner he reasonably believed to be in the best interest of Winforge, and to refrain from self-dealing, at all times relevant to Plaintiffs' claims.

{21}   As the 80% majority shareholder of Winforge, Mr. McMahon owed a fiduciary duty to Plaintiffs to "exercise good faith, care, and diligence to make the

property of [Winforge] produce the largest possible amount, to protect [Plaintiffs'] interests, and to secure and pay over to [Plaintiffs] their just proportion of the income and of the proceeds of the corporate property." *Id.*

{22} By failing to hire an architect and general contractor and otherwise take the necessary steps to build the contemplated hotel, Mr. McMahon violated his fiduciary duty to Winforge and to Plaintiffs.

{23} By directing over $1,186,043.70 of the Coachman Loan proceeds to be paid directly to himself or to Matrix, Flagship or L&A without taking the steps necessary to build the contemplated hotel in accordance with the Agreement, Mr. McMahon knowingly engaged in improper self-dealing and breached his fiduciary duty to Winforge and Plaintiffs.

{24} Based on the facts established at trial, Mr. McMahon could not have reasonably believed his actions were in the best interests of Winforge and Plaintiffs.

{25} Based upon the foregoing, the Court concludes that Plaintiffs' claim for breach of fiduciary duty has been established against Mr. McMahon, and Plaintiffs are entitled to compensatory damages as a result, the precise amount of which is detailed below.

C. <u>Third Claim for Relief — Gross Negligence for Failure to Hire a General Contractor</u>

{26} "Gross negligence has been defined as 'wanton conduct done with conscious or reckless disregard for the rights and safety of others.'" *Toomer v. Garrett*, 155 N.C. App. 462, 482, 574 S.E.2d 76, 92 (2002). "An act or conduct rises to the level of gross negligence when the act is done purposely and with knowledge that such act is a breach of duty to others, *i.e.*, a *conscious* disregard of the [rights and] safety of others." *Yancey v. Lea*, 354 N.C. 48, 53, 550 S.E.2d 155, 158 (2001) (emphasis in original).

{27} A successful claim for gross negligence requires proof of wanton conduct, and "each of the elements of negligence, including duty, causation, proximate cause, and damages." *Toomer*, 155 N.C. App. at 482, 574 S.E.2d at 92. However, the

difference between ordinary negligence and gross negligence is substantial. *McDevitt v. Stacy*, 148 N.C. App. 448, 460, 559 S.E.2d 201, 211 (2002).

{28} "A duty is defined as an obligation, recognized by the law, requiring the person to conform to a certain standard of conduct, for the protection of others against unreasonable risks." *Guthrie v. Conroy*, 152 N.C. App. 15, 25, 567 S.E.2d 403, 411 (2002). "No legal duty exists unless the injury to the plaintiff was foreseeable and avoidable through due care." *Stein v. Asheville City Bd. of Educ.*, 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006). The foreseeability of the plaintiff's injuries "depends on the facts of the particular case." *Id.* at 328, 626 S.E.2d at 267–68.

{29} Based on the facts proven at trial, Mr. McMahon's failure to take proper and appropriate action to hire a duly-licensed general contractor breached the Agreement with Plaintiffs, was without legal or other excuse, was undertaken at a time when Mr. McMahon was directing substantial sums under the Coachman Loan to himself and his affiliated entities, was done with conscious or reckless disregard for the rights of Plaintiffs, and was done with knowledge that such actions were a breach of his duty to Plaintiffs and were likely to cause Plaintiffs injury. Mr. McMahon's conduct was therefore wanton and constituted gross negligence.

{30} Based upon the foregoing, the Court concludes that Plaintiffs' claim for gross negligence has been established against Mr. McMahon, and Plaintiffs are entitled to compensatory damages as a result, the precise amount of which is detailed below.[10]

D. <u>Fifth Claim for Relief — Negligent Failure to Obtain a Building Permit</u>

{31} "To recover damages for actionable negligence, plaintiff must establish (1) a legal duty, (2) a breach thereof, and (3) injury proximately caused by such breach." *Petty v. Cranston Print Works Co.*, 243 N.C. 292, 298, 90 S.E.2d 717, 721 (1956).

---

[10] Plaintiffs' fourth claim for relief – for negligent failure to require a performance bond of the general contractor – was alleged in the alternative and asserted only in the event Mr. McMahon was found to have hired a licensed general contractor. Because the Court has found that Mr. McMahon did not hire a licensed general contractor, Plaintiffs' fourth claim for relief should be dismissed with prejudice.

{32} Based on the facts proven at trial, Mr. McMahon failed to exercise due care in the performance of his legal duty to Plaintiffs under the Agreement to obtain a building permit and thereby proximately caused Plaintiffs substantial injury.

{33} Based upon the foregoing, the Court concludes that Plaintiffs' claim for negligence has been established against Mr. McMahon, and Plaintiffs are entitled to compensatory damages as a result, the precise amount of which is detailed below.

E. <u>Sixth Claim for Relief — Fraud</u>

{34} A successful claim for fraud requires "'(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.'" *Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 481, 593 S.E.2d 595, 598 (2004).

{35} "The statute of limitations for actions for fraud is three years pursuant to N.C. Gen. Stat. § 1-52(9). A cause of action alleging fraud is deemed to accrue upon discovery by plaintiff of facts constituting the fraud. 'Discovery' is defined as actual discovery or the time when the fraud should have been discovered in the exercise of due diligence." *Carlisle v. Keith*, 169 N.C. App. 674, 683, 614 S.E.2d 542, 548 (2005) (internal citations omitted).

{36} Plaintiffs' fraud claim is based on Mr. McMahon's failure to disclose to Plaintiffs at the time they entered into the Agreement on April 5, 2004 that he intended to build the Wingate hotel using modular construction. Mr. Thomas testified that Plaintiffs were informed of Mr. McMahon's plan to construct a modular unit-style hotel no later than two weeks after April 5, 2004. However, Plaintiffs did not file suit until November 7, 2008 – more than three years after Plaintiffs admitted that they discovered Mr. McMahon's fraudulent conduct.

{37} Accordingly, the Court concludes that Plaintiffs' claim for fraud has not been established against Mr. McMahon, and Plaintiffs' sixth claim for relief for fraud should therefore be dismissed with prejudice.

F.  <u>Measure of Damages</u>

i.  <u>Compensatory</u>

{38}   The purpose of an award of damages is to "restore the victim to his original condition, to give back to him that which was lost *as far as it may be done by compensation in money*." *Shera v. N.C. State Univ. Veterinary Teaching Hosp.*, 219 N.C. App. 117, 126, 723 S.E.2d 352, 357 (2012).  "The objective of compensatory damages is to restore the Plaintiff to his original condition or to make the Plaintiff whole." *Watson v. Dixon*, 352 N.C. 343, 347, 532 S.E.2d 175, 78 (2000).

{39}   As reflected in paragraph 28 of the above Findings of Fact, Plaintiffs are entitled to Compensatory Damages as a proximate result of Mr. McMahon's breach of contract, breach of fiduciary duty, negligence, and gross negligence in the total amount of $1,000,000.00.

{40}   As reflected in paragraph 29 of the above Findings of Fact, Plaintiffs are further entitled to recover damages in the form of prejudgment interest at the legal rate from the date of breach in the amount of $688,202.40.

{41}   The Court specifically declines to award Plaintiffs lost profits damages because both the 2003 appraisal of the value of the "as built" hotel in 2008 (i.e., $7,700,000) and Plaintiffs' estimated annual return of $50,000 "for 20, 25, 30 years" had the hotel been built, (Trial. Transcript, 35:13–20), are simply too speculative and devoid of reasonable certainty to provide a basis for a damages award. *See generally, e.g.*, *Olivetti Corp. v. Ames Business Systems, Inc.*, 319 N.C. 534, 546, 356 S.E.2d 578, 585, (1987) ("As part of its burden, the party seeking damages must show that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty."); *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.*, 292 N.C. 557, 234 S.E.2d 605 (1977) ("[E]vidence of damages must be sufficiently specific and complete to permit the jury to arrive at a reasonable conclusion."); *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 377, 542 S.E.2d 689, 693 (2001) ("With respect to lost profits, our courts have refused to permit recovery based upon speculative forecasts,

requiring proof that absent the wrong, profits would have been realized in an amount provable with 'reasonable certainty.'").[11]

ii. Punitive Damages

{42}  "Punitive damages may be awarded, in an appropriate case and subject to the provisions of this Chapter, to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." N.C.G.S. § 1D-1 (2014).  "Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded: fraud, malice, willful or wanton conduct." N.C.G.S. § 1D-15 (2014).  Mere breaches of contract cannot support a claim for punitive damages.  *Richardson v. Bank of Am., N.A.*, 182 N.C. App. 531, 558, 643 S.E.2d 410, 427 (2007).

{43}  Plaintiffs did not seek punitive damages in their Amended Complaint or at trial and make their request for the first time in their Post-trial Brief. Nevertheless, under North Carolina law, a party may recover punitive damages where the party did not expressly plead for such relief "if [the party's] pleading fairly apprises opposing parties of facts which will support an award of punitive damages."  *Holloway v. Wachovia Bank & Trust Co., N.A.*, 339 N.C. 338, 345, 452 S.E.2d 233, 237 (1994).  Based on the evidence of record, however, the Court is not convinced that Mr. McMahon was fairly apprised in the Amended Complaint that punitive damages could potentially be assessed against him in this action and, as a result, does not find an award of punitive damages to be fair and appropriate under the facts and circumstances of this case.  Accordingly, the Court denies Plaintiffs' request for punitive damages.

iii. Costs

{44}  "In actions where allowance of costs is not otherwise provided by the General Statutes, costs may be allowed in the discretion of the court.  Costs

---

[11] In actions for negligence, Plaintiffs may recover losses for pain and suffering, among other damages. *See Iadanza v. Harper*, 169 N.C. App. 776, 780, 611 S.E.2d 217, 221 (2005).  Plaintiffs have not sought recovery for pain and suffering in the Amended Complaint or in the course of trial. Accordingly, the Court declines to consider this category of damages.

awarded by the court are subject to the limitations on assessable or recoverable costs set forth in G.S. 7A-305(d), unless specifically provided for otherwise in the General Statutes." N.C.G.S. § 6-20 (2014).

{45} The Court concludes, in its discretion, that Plaintiffs should be awarded their reasonable costs in pursuing this litigation and that Plaintiffs should have fourteen (14) days from the date of entry of this Verdict and Final Judgment to submit to the Court a bill of the recoverable costs reasonably incurred in the prosecution of this action.[12]

**NOW THEREFORE**, based upon the foregoing **FINDINGS OF FACT** and **CONCLUSIONS OF LAW**, it is **ORDERED**, **ADJUDGED**, and **DECREED** that:

{46} Plaintiffs Donny and Sandra Moore Thomas shall have and recover from Defendant Byron McMahon damages in the total amount of $1,000,000.00, plus prejudgment interest at the legal rate from November 15, 2006 in the total amount of $688,202.40 and post-judgment interest at the legal rate until the judgment is satisfied.

{47} The costs of this action, excluding attorneys' fees, shall be taxed to Defendant Byron McMahon.

{48} Plaintiffs Donny and Sandra Moore Thomas shall have through and including fourteen (14) days from the entry of this Verdict and Final Judgment to submit to the Court a bill of Plaintiffs' recoverable costs in prosecuting this action.

{49} All parties shall bear their own attorneys' fees.

{50} All other requested relief is **DENIED**.

---

[12] Attorneys' fees are available where provided by statute. *See* N.C.G.S. § 7A-305(d) (2014); *Belk v. Belk*, 221 N.C. App. 1, 12–13, 728 S.E.2d 356, 363 (N.C. Ct. App. 2012); *Ehrenhaus v. Baker*, No. 08 CVS 22632 ¶ 12 (N.C. Super. Ct. Mar. 25, 2014) (determining reasonableness of attorneys' fees). Plaintiffs have not sought and do not now seek attorneys' fees under any statute, and therefore, the Court concludes Plaintiffs should bear their own attorneys' fees.

**SO ORDERED**, this the 23rd day of June, 2015.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases